JOHN A. STEER COMPANY v. UNITED STATES (No. 5210)*

United States Court of Customs and Patent Appeals, June 2, 1966

*Allerton deC. Tompkins* for appellant.

*John W. Douglas*, Assistant Attorney General, *Alan S. Rosenthal, Howard J. Kashner* for the United States.

[Oral argument April 5, 1966, by Mr. Tompkins and Mr. Kashner]

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Associate Judges

Almond, Judge, delivered the opinion of the court:

This is an appeal by John A. Steer Company from a judgment of the United States Customs Court, Second Division, which overruled its protest against the collector's classification of rectangular coordinate plotters[1] as "mathematical instruments," dutiable under paragraph 360 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, at the rate of 25½ percent ad valorem. The importer claimed in the court below that the rectangular coordinate plotters should have been classified under paragraph 360 as "drawing instruments," dutiable at the rate of 19 percent ad valorem. The Customs Court, on the authority of this court's decision in *United States* v. *F. Weber Co.*, 25 CCPA 433, T.D. 49506, held that the instruments were properly classified as "mathematical instruments."

---

*C.A.D. 879.

[1] The subject goods are also denominated a rectangular coordinatograph. The two terms describe the same instrument.

The questions presented here for review are (1) whether appellant has overcome the presumption of correctness of the Collector of Customs classification of the subject goods as "mathematical instruments" and (2) whether there is sufficient evidence to sustain appellant's claim that the subject goods are "drawing instruments." Upon consideration of the evidence adduced below and the applicable law, we find for appellant on the stated question and therefore reverse the decision below.

Paragraph 360 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, provides in pertinent part:

Scientific and laboratory instruments, apparatus, utensils, appliances (including mathematical instruments but not including surveying instruments), and parts thereof, wholly or in chief value of metal, * * * finished or unfinished, not specially provided for:

   *      *      *      *      *      *      *

Other * * * _____ 25½% ad val.
Drawing instruments, and parts thereof, wholly or in chief value of metal_____ 19% ad val.

The only testimony in the case is by one Francis X. McWilliams, the sales manager for the industrial electronics division of Aero Service Corp. (Aero), the actual importer here. Aero is engaged in topographic mapping and geophysical surveying. It also prepares maps used to teach geography in schools and manufactures industrial electronic instruments such as plotting equipment operated from computers.

The description of the subject instrument and the manner in which it operates is most accurately depicted by Mr. McWilliams' testimony adduced on both direct and cross-examination. The pertinent testimony reads:

Q. Will you kindly state what a coordinatograph is? A. Yes. It is a unit which is used to draw lines.

Q. And, why do you refer to it as a drawing instrument? Because it is equipped with a ruling pen and is used to draw lines parallel to X and Y.

   *      *      *      *      *      *      *

Q. Now, you indicated that a coordinatograph draws parallel lines. A. That is correct. It draws only lines which are parallel to each other.

Q. Is that done accurately by this instrument? A. Very accurately.

Q. To what extent is this instrument accurate in drawing parallel lines?

A. The instrument's accuracy is 15/10,000ths of an inch in 47 and ½ inches.

   *      *      *      *      *      *      *

Q. Now, what type of person uses a coordinatograph? A. A draftsman.

Q. And, what is a draftsman? A. Essentially a draftsman accepts information which has been perhaps provided by an engineer and creates this information into a graphic form.

Q. Does a coordinatograph operate upon a material with a particular kind of surface? A. The coordinatograph will draw lines on any surface that can accept a drawn line.

\* \* \* \* \* \* \*

Q. According to your knowledge and experience, are coordinatographs used for mathematical applications? A. None that I know of.

Q. Can you explain that more fully please? A. Yes. The unit is used only to draw lines and in order to do any type of calculations, you would be required to have more than one unknown value, so you have to have several values in order to do any computation.

Q. And, does a coordinatograph provide you with more than one unknown factor? A. Since it only draws, it doesn't provide you with any figures that you could do computation with.

Q. Can you compute with a coordinatograph? A. No.

\* \* \* \* \* \* \*

XQ. Does this instrument draw cross lines? A. Well, if you mean lines which are perpendicular and parallel to the rails, yes.

XQ. In other words, it does more than draw parallel lines, is that correct? A. No, I didn't say that. They draw a line perpendicular to each other that would be still parallel to X and Y.

\* \* \* \* \* \* \*

XQ. And, do you have a microscope there? A. Yes.

XQ. What is the purpose of the microscope? A. To observe points, intersections of the lines that you have drawn.

\* \* \* \* \* \* \*

XQ. In other words, when you draw a line perpendicular to another line, you really make an X, am I right? A. That is correct.

\* \* \* \* \* \* \*

XQ. It makes a point, does it not, where the two lines cross would be the center point of the perpendicular line to the other line? A. That would be the center point of the intersection of those lines.

XQ. And, isn't that used for computing the distances of elevations of mountains and ranges and rivers and so forth? A. Absolutely not.

\* \* \* \* \* \* \*

XQ. Now how do you use this instrument in connection with determining elevations? A. You don't use it in determining elevations.

\* \* \* \* \* \* \*

XQ. In other words, by the use of this article, you could not tell the elevation of a mountain? A. No, indeed.

XQ. Or, the depth or height? A. No.

\* \* \* \* \* \* \*

XQ. By what method on the Exhibit Number 1 which is the instrument involved here, can you determine the length of the lines which you are drawing? A. Almost the same as you would with a ruler. A ruler has numbers on it and you can either draw a line of 12 inches or you can measure a line and it reads 12 inches. This unit is a rack and pinion so that you can either draw a line of a given dimension or you can look at your manuscript and determine if that line is drawn at the correct length.

XQ. In other words, you can determine the length of a line by the use of this instrument? A. You can measure the length of the same as you had drawn the line.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

XQ. Is this article used at all in computing in any manner whatsoever. A. None that I am aware of.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

XQ. What are coordinates? A. They would be the values which would locate something precisely, such as longitude and latitude.

XQ. And, would that be by any mathematical computation? A. The mathematics of longitude and latitude has been established long before you get it to a plotter.

Distillation of this and the remainder of the testimony compels one to the conclusion that the subject goods are nothing more or less than instruments for drawing extremely accurate parallel lines.

The principal definition in Webster's Third New International Dictionary (1961 ed.) for the term "mathematics" reads: a science that deals with the relationship and symbolism of number and magnitudes and that includes quantitative operations and the solution of quantitative problems. The same source defines "drawing" as: the projection of an image or a series of points by the forming of lines on a surface (as by use of a pencil, pen, or etcher's point).

The latter definition is, in our view, aptly descriptive of the function of a rectangular coordinate plotter as it has been described by the testimony of record. ▮▮ The fact that a rectangular coordinate plotter, with all its sophisticated paraphernalia, is capable of inscribing extremely accurate parallel lines is not detrminative of the issue. It is this latter attribute of the subject goods upon which the appellee has focused its attention in contending for the mathematical instrument classification.

Of necessity, classification requires a case-by-case approach. We eschew any attempt to formulate a definition of mathematical instrument or drawing instrument. Generally, one would consider a mathematical instrument to be designed to perform a mathematical operation such as adding, subtracting, multiplying, dividing, integrating, etc. Here, the uncontroverted testimony is that rectangular coordinate plotters can perform none of these operations. Appellant states in his brief:

The coordinatographs here under appeal are not used in connection with the science of mathematics. They do not calculate. They do not themselves perform a mathematical operation. They can not be used to determine a surface area except as a ruler. They do not record height or an angle of inclination. They can not be used for any mathematical applications. Their only function is to enable a draftsman to draw straight parallel lines accurately, one line at a time. \* \* \*

The testimony supports appellant's contentions. While not desiring to ascribe controlling weight to any or all of these functions, or more precisely, the absence thereof, we do believe they serve to illuminate the distinction between an instrument which is mathematical in operation and one which is not. Certainly, the lack of these functions tends to argue against the classification contended for by appellee.

The court below considered our decision in *United States* v. *F. Weber Co.*, supra, as controlling over the case at bar. There this court upheld the importer's claim that a pantograph should be classified as a mathematical instrument rather than as a drawing instrument. As we stated above, each case of this sort must be determined on its own facts and thus we see no *compelling* reason for adhering to *Weber* which concerned classification of a device different from the one here in issue.

Appellant has made the following comparison between the coordinate plotters here in issue and the pantographs of the *Weber* case:

1. A pantograph is entirely different from a coordinatograph, and the two articles perform completely different functions.

2. A pantograph operates automatically to reproduce a new image of the same shape but to a different scale from the original script. It performs these things itself with mathematical precision and it must be adjusted to reproduce the new drawing to the desired scale.

3. A coordinatograph is like a ruler having only one scale. It does nothing automatically. It is an accurate ruler, but it performs no mathematical function by itself.

We think there is substantial merit in the distinction appellant makes. We further express our agreement with the several lower court decisions cited by appellant concerned with the classification of goods as mathematical instruments. In holding that a calculator was a mathematical instrument, the court in *A. S. Aloe & Co.* v. *United States*, 53 Treas. Dec. 973, Abs. 5743, stated:

By raising or lowering the outer cylinder to the desired figures on the table one may calculate mathematically with the aid of this apparently simple and compact device. * * *

In *Keuffel & Esser Co.* v. *United States*, 56 Treas. Dec. 902, Abs. 10193 (see also *F. Weber Co.* v. *United States*, 71 Treas. Dec. 761, T.D. 48961), the trial court held that planimeters "used to calculate the area of a circular surface" should be classified as mathematical instruments.

In *Engis Equipment Co.* v. *United States*, 16 Cust. Ct. 86, C.D. 990, the lower court held that clinometers should be classified as mathematical instruments, stating:

* * * the imported clinometers operate mechanically to record with mathematical precision the angle of inclination of plane surfaces, a result which would

otherwise require a careful mathematical calculation, or recourse to certain devices, other than clinometers, equipped to measure angles.

We find the decision below upholding the classification of the rectangular coordinate plotters as mathematical instruments to be clearly contrary to the weight of the evidence. *United States* v. *Charles Garcia & Co.*, 48 CCPA 140, C.A.D. 780. The evidence, in our opinion, affirmatively supports appellant's claim that the plotters are drawing instruments.

For the foregoing reasons, the judgment of the Customs Court is *reversed*.

———

SMITH, Judge, concurring.

An underlying concept of the dissenting opinion is that since the imported rectangular coordinate plotters may be used to make measurements, they are properly classified under par. 360 as "mathematical instruments." It seems to me that such a classification on this basis would be contrary to the intent of Congress. Measuring devices such as rules and micrometers are seperately classified in par. 396 which I take as a rather clear indication that Congress intended the term "mathematical instruments" to include something other than mere measuring devices as exemplified by rules and micrometers. It seems to me Congress by setting up within par. 360 different classifications for "mathematical instruments" and "drawing instruments * * * of chief value of metal" has made it necessary to decide this issue, not the extraneous issue raised by the dissenting opinion as to the proper classification of the imported merchandise because of its use as a measuring device.

The Customs Court, in sustaining the collector's classification, placed reliance on this court's decision in *United States* v. *F. Weber Co.*, 25 CCPA 433, T.D. 49506 (1938), which the majority discusses as concerning a "classification of a device different from the one here in issue." The dissenting opinion does not consider this an adequate factual distinction. My view of the *Weber* case differs from both the majority and the dissenting opinion and it seems to me to contain much of value which should be utilized here to aid in our determination of the meaning of the terms "mathematical instruments" and "drawing instruments" in par. 360.

I find it interesting that the court in the *Weber* opinion pointed out:

* * * It is the gist of the Government's contention that "mathematical instruments as intended by Congress comprise instruments whose ultimate object is for *computation* and not for drawing or sketching or tracing where the performance of the instrument may require a mere setting of a dial or arm." (25 CCPA at 435–36.)

The testimony in the *Weber* case concerning the imported pantographs and their functions, summarized by the court, was that:

\* \* \* pantographs are used for making a reduced, an enlarged, or an exact copy of a plane figure; that they are used by etchers, engravers, map makers, lithographers, educational institutions for instruction purposes, etc.; that in use, one part or pointer is placed over a drawing and by moving that part or pointer a reproduction of the identical drawing, traced, appears on another paper, either to the same scale or to a larger or smaller scale, depending on the ratio to which the instrument is set by the axis; that the reproduction does not necessarily have to be a mechanical drawing, and that the "instrument is based on mathematics, its principles, and therefore, your settings are mathematically obtained." (25 CCPA at 434–35.)

Thus, it seems to me the gist of the *Weber* decision and the basis for distinguishing it here is that the pantograph there was found to be "based on mathematics," and "its principles," and the fact that the "settings are mathematically obtained." The court's summary after its review of the definitions of "mathematical," "pantograph" and "drawing" can be helpful in resolving the issue in the present case. I here refer to the statement in the *Weber* decision that:

From the foregoing definitions and kindred ones by other authorities, it seems to us that a drawing device or instrumentality means something broader than, or at least different from, a mathematical instrument. The definitions of drawing above quoted imply something more than a mere precise tracing or reproduction of a map, design, drawing, or other picture. There is implied by drawing a certain originality of conception, although, as of course, there may be a drawing which is a reproduction of another drawing. (25 CCPA at 436–37.)

In the *Weber* case the court reiterated its position that the pantographs there in issue "are shown to be capable of minute mathematical precision in producing the various outlines, or copies, which it is their function to produce, and, upon the whole, we are of the opinion that they are clearly comprehended within the term 'mathematical instruments,' as that term is used in paragraph 360, *supra*." (25 CCPA at 437.)

It seems clear to me, therefore, that at least since the *Weber* case there has been engrafted upon the meaning of the term "mathematical instruments" in par. 360 the concept of instruments "whose ultimate object is for *computation*" as distinguished from "drawing instruments".

Our proper inquiry here begins and ends with whether the imported rectangular coordinate plotters in issue have been shown in this record to be "drawing instruments" which the court in the *Weber* case referred to as being "broader than or at least different from, a mathematical instrument." The testimony of the single witness may well have had, in the words of the dissenting opinion, "a considerable bias". Even if this be true, this testimony and the exhibits taken together

establish that the imported devices are not "mathematical instruments" as defined in the *Weber* case. They perform no function comparable to the mathematical computation function relied upon in the *Weber* case.

For the foregoing reasons, I concur in the reversal of the decision of the Customs Court.

---

RICH, Acting Chief Judge, dissenting.

I respectfully dissent from the conclusion that the imported coordinate plotters are not "mathematical instruments." That they are drawing instruments, because used for drawing grid lines for maps, I have no doubt; but if they are properly termed mathematical instruments, within the common meaning of that term, then they are more than drawing instruments and not classifiable as such. Or at least if the more exacting term "mathematical instruments" fits the imports then they should be so classified under the doctrine of relative specificity, considering that some mathematical instruments are also used for drawing, such as the pantograph in *United States* v. *F. Weber Co., Inc.*, 25 CCPA 433, T.D. 49506 (1938).

I agree that the classification must be determined case by case on the basis of the evidence which is, in this case, of the utmost simplicity. We have some excellent photographs of the coordinate plotter and the testimony of a single witness with a considerable bias, since he was the sales manager of the importer, Aero Service Corporation, the nominal plaintiff being its Customs House broker. The testimony as a whole, notwithstanding its obvious careful preparation to support the protest, serves with the photographs to make it clear how the apparatus works and what it will do, though arguments of counsel on both sides considerably muddy the waters.

The majority opinion lacks a description of the coordinate plotter, wherefore I find it necessary to describe it and what it does. This instrument is a sort of glorified, mechanized T-square with the super-accuracy of a fine machine tool. Grid lines on maps, which, *inter alia*, it is designed to draw, consist of north-south or "Y" coordinate lines and east-west or "X" coordinate lines. In the type of map involved, all Y lines are parallel and all X lines are perpendicular thereto and parallel to each other. The witness refers to latitude and longitude coordinates by way of example, but they do not run parallel and perpendicular as do grid lines. The essence of forming a grid is to space the grid lines *equally*. Various standard map scales are used and the evidence is clear that the plotters are imported with various scales.[1]

---

[1] Those available per Exhibit 2 are 1 : 250, 1 : 500, 1 : 1000, 1 : 2000 in the metric system and 1 : 1200, 1 : 2400, 1 : 4800, 1 : 6000 in the English system.

Grid spacing is generally related to scale, as anyone who has read such maps knows.[2]  Accurate maps require accurate grid lines and making them is the purpose of the plotters.

The plotter consists of a table top, 47.25 x 47.25 inches (1200 x 1200 mm), along one edge of which is a fixed X rail or abscissa rail. It is machined to provide a track and along the track are scales against which may be read the movement of the T-square member which rides on this track.   On the head of the T-square member there is also a rotating dial with numbers and a pointer which evidently ties in with the scale on the X rail.   The description on Exhibit 2 states:   "Counters with interchangeable dials for each scale."

The T-square member, as I have termed it, is described by the witness as the Y rail or ordinate rail.   Riding along the X rail it maintains a position perpendicular thereto.   It too carries accurately machined tracks and scales, along which moves a wheeled carriage and on this carriage is another dial like the one on the head of the Y rail. The carriage supports a microscope in which is a reticle [3] having a cross hair or circle, utilized, as the witness said, "to observe an intersection or the start of one of the lines that you would draw and the centering of the cross hair at a position would be in the optical system so that you would be able to place the X and Y character precisely at that location."

The microscope is a combination unit referred to in Exhibit 2, the description attached to the photograph being as follows:

Pricker-microscope which incorporates pricking point and microscope in one unit, avoids errors due to multiple prickers.

We are not told what is meant by "multiple prickers" but it seems clear that the pricking point associated with the microscope is for use to make a point, measured as to its location from coordinates and *located* on the paper by use of the coordinate scales on the plotter, which is the opposite of the microscope's function of viewing marks already made and centering the plotter on them.   This obviously is not a mere drawing function and the instrument is not just used to draw lines.

I find two flaws in the reasoning of the majority opinion as to this piece of apparatus:   (1)  It accepts uncritically the bald assertions of appellant's counsel that the plotter performs no "mathematical opera-

---

[2] "Grid" is defined in Webster's Seventh New Collegiate Dectionary as:   "*b:* a network of uniformly spaced horizontal and perpendicular lines for locating points by means of coordinates."   The same dictionary defines coordinates as:  "*2a:* any of a set of numbers used in specifying the location of a point on a line, or surface, or in space."   Thus with coordinates any point on a map having a grid can be accurately located or such a point can be placed on the map in the course of making it.

[3] For those who do not know the term, Webster's Seventh New Collegiate Dictionary defines reticle as:   "a system of lines, dots, cross hairs, or wires in the focus of the eyepiece of an optical instrument."   Appellee's brief refers to it is a "rectile."

**76**

tion." (2) It adopts a too restricted definition of mathematics, as beginning with addition, subtraction, etc. In my view, according to lexicographers and other authorities, mathematics begins with numbers, counting, measurement and, in particular, precise measurement, which we are dealing with here, is deemed to be included in mathematics. As to the relevant evidentiary fact, the plotter *locates points* with an accuracy of ±0.0015 inch (0.04mm) in 47.25 inches. As to the definitions, Webster's New International Dictionary, 2d Ed. (1937) contains these relevant definitions:

*mathematics* n. That science, or class of sciences, which treats of the exact relations existing between quantities, or magnitudes and operations, and of the methods by which, in accordance with these relations, quantities sought are deducible from others known or supposed; the science of serial, spatial, quantitative, and magnitudal relations; the science of order.

*mathematical a* Of, pertaining to, or according to mathematics; hence, theoretically precise; accurate; as, *mathematical* geography, instruments, precision.

Now, a careful effort was made in presenting the testimony of the single witness to create the impression that the coordinate plotter will do nothing more than enable a draftsman to draw lines, hence is nothing more than a drawing instrument. But one need do no more than contemplate its construction and operation and look more critically at some of the testimony dragged from the witness on cross examination to see that this is not so.

In the first place, the plotter will admittedly make very accurate measurements, and measurement is part of mathematics. Hogben, in his "Mathematics for the Million" (W. W. Norton & Co., Inc., 1937), titles his Chapter II "First Steps in Measurement or Mathematics in Prehistory." The above definition shows that instruments for making precise determinations of spatial relations are mathematical instruments, and that is what the plotter does. The very name "coordinate plotter" signifies mathematical function. I will quote some testimony omitted by the majority (all emphasis mine):

XQ. Can you then explain how this instrument is used? A. Certainly. The unit is used to draw the grid which would ultimately control the completed map. Now, longitude and latitude are the coordinates upon which civil engineering maps are predicated. *We must lay out a grid network with a certain size grid, 5 inches, two inches, or whatever it may be* on a manuscript which is normally 45 inches square that fits very conveniently on a plotting surface. * * *

\*     \*     \*     \*     \*     \*     \*

XQ. By what method on the Exhibit Number 1 which is the instrument involved here, can you *determine the length* of the lines which you are drawing? A. Almost the same as you would with a ruler. A ruler has numbers on it and you can either draw a line of 12 inches or *you can measure a line and it reads 12 inches.* This unit is a rack and pinion so that you can either draw a line of

a given dimension *or you can* look at your manuscript and *determine if that line is drawn at the correct length.*

XQ. In other words, you can determine the length of a line by the use of this instrument? A. *You can measure the length* of the same as you had drawn the line.

XQ. How is the *distance between parallel lines* determined by this instrument, Exhibit 1? A. How is the distance between—

XQ. Parallel lines determined? A. Almost again, you must use a ruler, establishing zero in one corner and you wish to draw a line 12 inches long, you would draw it out in ink to 12 inches. If you wish to draw the line parallel to that, *you could index the length, 5 inches perhaps, north, and then draw the next line parallel.*

XQ. If you wanted to *measure the distances between* two points, it would not always be necessary to draw a line between those two points but you could put point 1 and 2 and measure the distance? A. You could determine its co-ordinate location.

XQ. That is distance? A. Yes.

XQ. *That is measurements?* A. Yes.

A little later in his testimony the witness answered a question as to whether the microscope with its reticle could be used for measuring and said "it can be I guess used for measuring if you want to go back to something that had originally been drawn."

Clearly the instrument can be and normally is used for *measuring* and it is transparently clear that in making grids that is one of its primary functions and is the purpose of the attached scales and the microscope—to measure accurately, extremely accurately, with *mathematical* precision, the distance between the grid lines, utilizing the indexing function of the scales and dials. This plain fact is contrary to the testimony on direct examination that the instrument is used only to *draw* lines, which testimony and the arguments of counsel predicated on it I consider entitled to no weight. The exhibits speak for themselves, eloquently, and on cross examination the witness contradicted himself.

The name "coordinate plotter" clearly conveys to me another elementary function which I consider mathematical in character. Given either a grid or a map with a grid on it, one plots positions indicated by coordinates by starting accurately from the particular X and Y grid lines indicated by the first digits of the coordinates and then lays off within the square of the grid thus located the position determined by the remaining digits. This is done by drawing additional lines parallel to X and Y and the position is located on their intersection.[4] This is elementary map reading or making technique and what one would expect to do with a "coordinate plotter." It is determination of spatial relations by means of numbers, starting from an ordinate and an abscissa, which has the distinct odor of mathematics. At any

---

[4] The witness said: "XQ. What are coordinates? A. They would be the values which would locate something precisely, such as longitude and latitude."

rate, one with no knowledge of mathematics would have a hard time doing it.

Surely this instrument is as "mathematical" as the pantograph in the *Weber* case which I think the lower court properly followed.

I am of the opinion the judgment of the Customs Court was clearly correct and it should therefore be affirmed.